Docket No. 108285.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

WEST AMERICAN INSURANCE COMPANY, Appellee, v. YORKVILLE NATIONAL BANK *et al.*, Appellants.

*Opinion filed September 23, 2010.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion.

## OPINION

The issue in this case is whether the insured violated its liability insurance policy by failing to give timely written notice to the insurer as specified in the policy, thereby relieving the insurer of its duties to defend and indemnify. The appellate court held that the insured breached the policy's notice provision and was therefore not entitled to coverage. 388 Ill. App. 3d 769. For the following reasons, we reverse the appellate court.

## BACKGROUND

On September 24, 2001, Sheryl Kuzma filed a defamation lawsuit

in the circuit court of Will County against Yorkville National Bank (Yorkville) and its vice president, Bernard Wiegmann. Kuzma alleged that Wiegmann uttered certain false statements in his official capacity which damaged her professional reputation. At the time of the alleged defamation in November 2000, Yorkville was covered by a commercial general liability policy and commercial umbrella policy (collectively, the Policy) issued by West American Insurance Company (West American) for the period of September 17, 2000, to September 17, 2001. West American is owned by the Ohio Casualty Insurance Company (Ohio Casualty). The Policy lists the Zeiter-Dickson Insurance Agency (Zeiter-Dickson) as the agent. Zeiter-Dickson, at all relevant times, was an approved insurance agent of Ohio Casualty and West American.

On March 9, 2004, West American filed a declaratory judgment action denying coverage under the Policy based on late notice. Yorkville did not submit written notice of a claim for coverage until January 19, 2004, approximately 27 months after the defamation lawsuit was filed. The Policy's notice provision states:

> "SECTION IV–COMMERCIAL GENERAL LIABILITY CONDITIONS
>
> * * *
>
> 2. Duties in the Event of Occurrence, Offense, Claim or Suit.
>
> * * *
>
> b. If a claim is made or 'suit' is brought against any insured, you must:
>
> (1) Immediately record the specifics of the claim or 'suit' and the date received; and
>
> (2) Notify us as soon as practicable.
>
> You must see to it that we receive written notice of the claim or 'suit' as soon as practicable.
>
> c. You and any other involved insured must
>
> (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit' ***."

In its answer, Yorkville alleged that West American received oral

notice of the Kuzma suit on several occasions prior to receiving written notice on January 19, 2004. Yorkville contended that the oral notices to West American constituted "actual notice" triggering West American's duty to provide coverage.

At a bench trial, James Liggett, Yorkville's president, testified that in late 2001 or early 2002, he met with Richard Dickson, the Zeiter-Dickson insurance agent who had placed the Policy with Yorkville. Dickson was an agent for Zeiter-Dickson until 2003. Liggett told Dickson that Yorkville was "involved in a defamation lawsuit in Ottawa," that it was a "he said/she said sort of thing," and that it was not covered by the bank's directors & officers (D&O) insurance policy. According to Liggett, he asked Dickson if the Zeiter-Dickson Policy would cover the suit. Dickson replied, "Probably not. Most all of those policies are written the same anyway." Dickson did not testify at trial.

Liggett testified that he met with Joel Ottosen, another West American agent, sometime during the same time period. Liggett stated he told Ottosen that Yorkville was involved in a defamation liability case and asked if the Policy would cover it. According to Liggett, Ottosen gave "basically the same response" as Dickson, stating that the Policy probably would not cover the lawsuit. In his testimony, Ottosen denied having any conversation with Liggett about the defamation lawsuit before January 16, 2004. Ottosen testified that he first learned of the lawsuit on January 15, 2004, when Weigmann contacted him to find out whether his homeowner's policy covered the suit.

The defamation lawsuit was discussed at three meetings of the Yorkville board of directors in 2002. Dickson was in attendance at the meetings because he was a member of the board. According to the minutes, at the September meeting, Liggett reported to the board that "Attorney Cheryl Kuzman" was suing Yorkville and Wiegmann for allegedly derogatory comments made by Weigmann. At the November meeting, Liggett reported that expenses were high at the Ottawa bank branch as a result of legal fees related to the Kuzma litigation. Finally, at the December meeting, the board reviewed and approved the minutes from the November meeting.

In January 2004, Yorkville was advised by an unrelated insurance company that the Policy "should cover" the defamation lawsuit.

-3-

Liggett informed Ottosen of the lawsuit, who submitted the requisite claim forms and copy of the complaint to West American on January 19, 2004. The parties stipulated that on January 22, 2004, Carolyn Maher, a litigation specialist for West American, informed counsel for Yorkville that "there was insurance coverage for most of the allegations in the Kuzma complaint."

The trial on the Kuzma suit was set for March 15, 2004. On March 5, 2004, West American decided to deny coverage under the Policy based on late notice. Yorkville later settled the case with Kuzma on July 28, 2004, for $1.75 million. West American did not participate in any trial proceedings or settlement negotiations.

The circuit court found for Yorkville and against West American in the declaratory judgment action and awarded stipulated damages in the amount of $1,982,778.78. The court found that the conversation between Liggett and Dickson took place as described by Liggett and was "unrefuted." The court found that Liggett and Ottosen had a "passing conversation" in the bank, but the court made no finding as to the content of that conversation. Based on the conversation between Liggett and Dickson and the reports of the board meetings, the trial court found that West American received actual notice of the lawsuit in 2001 or 2002. The court further found that the written notice in 2004 was given within a reasonable time because Yorkville was told in 2001 or 2002 that the lawsuit was not covered.

The appellate court affirmed in part, reversed in part, and remanded.[1] 388 Ill. App. 3d 769. Citing to *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303 (2006), the appellate court held that Yorkville breached the Policy's notice clause as a matter of law by waiting until 27 months after the lawsuit was filed to submit a written claim for coverage and a copy of the complaint. The court found the late notice was unreasonable in light of the fact that

[1]On cross-appeal to the appellate court, Yorkville argued that the circuit court erred in determining that Yorkville was not entitled to sanctions under section 155 of the Insurance Code (215 ILCS 5/155 (West 2004)). The appellate court affirmed. 388 Ill. App. 3d at 781. Yorkville has not appealed that part of the appellate court's judgment.

-4-

discovery had closed and the case was scheduled to proceed to trial in eight weeks. The court held that actual notice had "no bearing" on the issue of whether Yorkville breached the written-notice provision. To hold that actual notice "trumps" the plain language of the policy, the court found, would "render the policy's written notice provision meaningless." 388 Ill. App. 3d at 777. Justice Schmidt specially concurred, noting that there was no reason not to enforce the contract language, which had been approved by the Department of Insurance. Justice Lytton concurred in part and dissented in part, contending that West American had a duty to defend and indemnify Yorkville pursuant to *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317 (1998), since it had received actual notice of the suit. 388 Ill. App. 3d at 783-84 (Lytton, J., concurring in part and dissenting in part). We granted Yorkville's petition for leave to appeal to this court. 210 Ill. 2d R. 315. We granted leave to the Complex Insurance Claims Litigation Association to file a brief on behalf of West American as *amicus curiae*.


ANALYSIS

In construing an insurance policy, we must ascertain and give effect to the intentions of the parties, as expressed in the policy language. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006). The policy must be construed as a whole, giving effect to every provision. *Country Mutual*, 222 Ill. 2d at 311. Unambiguous words in the policy are to be given their plain, ordinary, and popular meaning. *Country Mutual*, 222 Ill. 2d at 311. Where the policy language is ambiguous, courts are to construe the policy liberally in favor of coverage. *Country Mutual*, 222 Ill. 2d at 311.

Insurance policy notice provisions impose valid prerequisites to insurance coverage. *Country Mutual*, 222 Ill. 2d at 311. The policy language in the notice provision at issue states that an insured must "see to it that we receive written notice of the claim or 'suit' as soon as practicable." A policy provision requiring notice "as soon as practicable" means notice must be given "within a reasonable time." *Country Mutual*, 222 Ill. 2d at 311, quoting *Barrington Consolidated High School v. American Insurance Co.*, 58 Ill. 2d 278, 281 (1974). Whether notice has been given within a reasonable time depends on

the facts and circumstances of each case. *Country Mutual*, 222 Ill. 2d at 311-12. An insured's breach of a notice clause in an insurance policy by failing to give reasonable notice will defeat the right of the insured to recover under the policy. *Country Mutual*, 222 Ill. 2d at 312, citing *Simmon v. Iowa Mutual Casualty Co.*, 3 Ill. 2d 318, 322-23 (1954).

The timeliness of an insured's notice to its insurer generally is a question of fact for the trier of fact. *Northbrook Property & Casualty Insurance Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 465 (2000); *University of Illinois v. Continental Casualty Co.*, 234 Ill. App. 3d 340, 363 (1992). A reviewing court should overturn a trial court's factual findings only if they are against the manifest weight of the evidence. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 452 (2009). The following factors may be considered in determining whether notice to an insurer has been given within a reasonable time: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer. *Country Mutual*, 222 Ill. 2d at 313.

The parties agree that Yorkville sent written notice of the defamation lawsuit and a copy of the complaint on January 19, 2004, approximately 27 months after the underlying lawsuit was filed. The circuit court held that the 27-month delay was reasonable under the facts and circumstances in this case. The appellate court concluded that Yorkville breached the notice clause "as a matter of law." 388 Ill. App. 3d at 777. We hold that the trial court's finding was not against the manifest weight of the evidence.

Under the first *Country Mutual* factor, the specific language in the Policy's notice provision does not aid in our reasonableness analysis because it does not identify a specific time frame for giving notice. Instead, it requires Yorkville to "see to it that [West American] receive written notice of the claim or 'suit' as soon as practicable" and to "[i]mmediately send us copies of any demands, notices, summonses, or legal papers received in connection with the claim or 'suit.' " The term "immediate," in the context of insurance policy notice provisions, has been interpreted in a similar manner to the

phrase "as soon as practicable." See *Zurich Insurance Co. v. Walsh Construction Co. of Illinois, Inc.*, 352 Ill. App. 3d 504, 512 (2004) (" 'Immediate' in this context 'has been uniformly interpreted to mean within a reasonable time, taking into consideration all the facts and circumstances' "), quoting *Kenworthy v. Bituminous Casualty Corp.*, 28 Ill. App. 3d 546, 548 (1975).

The second factor mentioned by *Country Mutual* is the insured's sophistication. Yorkville is a bank presumed to be sophisticated in the areas of commerce and insurance. Accordingly, this factor weighs in favor of finding that Yorkville's delay in sending written notice was unreasonable.

Next, we consider the insured's awareness of an event which may trigger insurance coverage. Liggett testified that he learned about the Kuzma matter in November 2000, when Weigmann informed him that Kuzma complained about defamatory remarks made by Weigmann. Liggett advised the bank's attorney that he would investigate the matter because Kuzma was "threatening a suit with the bank." Two weeks later, Liggett telephoned Kuzma to inform her that he had checked with the parties involved and that none of the people at the meeting felt that Weigmann had behaved inappropriately. Liggett then heard nothing from Kuzma for 10 months until Kuzma filed her lawsuit in September 2001. Thus, Yorkville was aware in November 2000 of the potential for a lawsuit and aware in September 2001 that a lawsuit had been filed. This factor also weighs on the side of unreasonableness.

With regard to the insured's diligence in ascertaining whether coverage is available, a lengthy delay in providing notice is not an absolute bar to coverage provided the insured's reason for the delay is justifiable under the circumstances. See *Northbrook Property & Casualty Insurance Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 465 (2000); *McFarlane v. Merit Insurance Co.*, 58 Ill. App. 3d 616, 619 (1978). Courts have recognized that an insured's reasonable belief of noncoverage under a policy may be an acceptable excuse for the failure to give timely notice, even where the delay is lengthy. See, *e.g.*, *Allstate Insurance Co. v. Carioto*, 194 Ill. App. 3d 767, 780 (1990) (2 ½-year delay excused because 19-year-old insured could not have reasonably known that the occurrence would have been covered by his mother's homeowner's policy); *Grasso v. Mid-*

*Century Insurance Co.*, 181 Ill. App. 3d 286, 290 (1989) (two-year delay excused because insured did not reasonably believe that an accident in her boyfriend's Jeep was covered by her father's excess coverage insurance policy); *Brotherhood Mutual Insurance Co. v. Roseth*, 177 Ill. App. 3d 443, 449 (1988) (two-year delay excused because insureds did not reasonably believe that an accidental shooting which occurred outside their home would be covered by their homeowner's policy). Whether the insured, acting as a reasonably prudent person, believed the occurrence or lawsuit was not covered by the policy is a question of fact, which we review under the manifest weight standard. *Farmers Automobile Insurance Ass'n v. Hamilton*, 64 Ill. 2d 138, 142-43 (1976).

Liggett testified that in "late 2001 or early 2002," he spoke with Dickson, the West American insurance agent who had placed the Policy with Yorkville. During an informal meeting at the bank, Liggett told Dickson "that we were involved in this defamation lawsuit in Ottawa. That it was kind of a he said/she said sort of thing and the D&O insurance didn't cover that type of suit." When Liggett asked Dickson whether the West American Policy covered the suit, Dickson replied, "Probably not. Most all of those policies are written the same anyway." Dickson did not ask Liggett for a copy of the complaint, nor did he offer to verify whether a complaint for defamation was covered under the Policy. The trial court found that it was "undisputed" that the conversation between Liggett and Dickson took place as described by Liggett because Dickson did not testify at trial.

The trial court found that Liggett's conversation with Dickson, coupled with the mention of the lawsuit at board meetings, "tips in favor of the insured as to diligence" and thus the delayed written notice was reasonable. That finding was not against the manifest weight of the evidence. After being informed by its agent that the Policy probably did not cover the lawsuit, Yorkville reasonably believed that sending written notice to its insurer would be futile. It was not until January 2004 that Yorkville discovered the lawsuit was covered by the Policy. At that time, Yorkville promptly sent written notice to West American. A reasonably prudent party in the position of the insured would not have continued to pursue coverage under the policy having been informed by its agent that the policy afforded no

coverage.

Finally, we consider whether West American suffered prejudice as a result of Yorkville's written notice in January 2004. See *Country Mutual*, 222 Ill. 2d at 317 ("the presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice"). No testimony was presented at trial as to whether West American was prejudiced by the delay in receiving written notice. The trial court further found that there was no evidence that West American investigated the defamation complaint or made any efforts to delay trial during the two months between receiving written notice and the scheduled trial date.

Moreover, the trial court held that West American received actual notice of the lawsuit in late 2001 or early 2002, within a few months of the lawsuit being filed and approximately two years before the case was scheduled for trial. Contrary to the appellate court's statement that actual notice has "no bearing" on whether notice was given within a reasonable time, actual notice to an insurer is relevant to whether the insurer has been prejudiced by a delay in receiving written notice as specified by the policy. "[W]here the insurance company has actual notice of the loss or receives the necessary information from some other source, there is no prejudice to the insurer from the failure of the insured to give notice of the claim." *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.*, 61 Ill. App. 3d 911, 917 (1978) (citing *Wehner v. Foster*, 331 Mich. 113, 117, 49 N.W.2d 87, 89 (1951), and *United States Fidelity & Guaranty Co. v. Church*, 107 F. Supp. 683, 689 (N.D. Cal. 1952)).

An insurance company is deemed to have "actual notice" of a lawsuit where it has sufficient information to locate and defend the suit. *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 329 (1998); *Progressive Insurance Co. v. Universal Casualty Co.*, 347 Ill. App. 3d 10, 22 (2004); *Federated Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 282 Ill. App. 3d 716, 726 (1996). "[I]n order to have actual notice sufficient to locate and defend a suit, the insurer must know both that a cause of action has been filed and that the complaint falls within or potentially within the scope of the coverage of one of its policies." *Cincinnati Cos.*, 183 Ill. 2d at 329-30; *Employers Insurance of Wausau v. Ehlco Liquidating*

*Trust*, 186 Ill. 2d 127, 143 (1999).

The trial court held that Liggett's "in passing" conversation with Dickson as well as the reports at the board meetings provided West American with sufficient information to "locate and defend" the defamation lawsuit. We agree. Through its authorized agent, the insurer knew both: (1) that a lawsuit had been filed against its insured; and (2) that the defamation suit potentially fell within the scope of coverage of the Policy. Although no details were given as to when the alleged defamation took place or where the lawsuit was filed, Liggett conveyed that the bank had been sued for defamation and that the alleged events took place in Ottawa, Illinois. Dickson was the authorized agent who had placed the West American Policy for Yorkville and thus should have been aware that the Policy provided coverage for defamation. West American was put on notice at an early stage in the litigation that Yorkville was a defendant in a lawsuit that was potentially covered under the policy. At the very least, the agent could have followed up with Yorkville by requesting to see a copy of the complaint before advising it that the lawsuit probably was not covered.

After considering all relevant factors, we find that, under the circumstances in the present case, Yorkville's written notice of the lawsuit to West American was given within a reasonable time and did not violate the notice provision in the Policy. Therefore, we reverse the appellate court's judgment that Yorkville is not entitled to coverage and affirm the circuit court's finding that West American had a duty to provide coverage under the Policy.

CONCLUSION

For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE FREEMAN, dissenting:

-10-

I disagree with today's opinion on several levels. Although the majority initially sets forth a framework within which to analyze the notice provisions of the insurance policy issued by West American to Yorkville, it neither applies that framework nor construes those provisions. Instead, my colleagues depart from our well-settled rules of insurance policy construction and analyze this appeal in a manner which tacitly undercuts our precedent and will engender confusion for the bench and bar. In addition, the majority unduly expands the concept of "actual notice" absent explanation or reason for doing so. Accordingly, I dissent.

## BACKGROUND

This dispute has its genesis in an underlying defamation action brought by Sheryl H. Kuzma (Kuzma) against Yorkville National Bank (Yorkville) and its vice president, Bernard Wiegmann.[2] Kuzma filed her complaint on September 24, 2001, in the circuit court of Will County.[3]

Kuzma, an attorney, sued Wiegmann in his capacity as an agent of Yorkville, for making false and defamatory statements about her in November 2000 to a group of local businessmen in connection with her representation of a client. A jury trial took place in March 2004, shortly after West American filed the declaratory judgment action that is the subject of this appeal. The jury returned a $2.2 million verdict in favor of Kuzma and against Yorkville and Wiegmann. The parties subsequently settled for the reduced amount of $1.75 million. Based upon its belief that Yorkville had breached the notice provisions of the insurance policy, West American did not participate in either the trial proceedings or in the settlement negotiations of the Kuzma action. Instead, West American filed the

---

[2]The Kuzma action was also brought against an additional defendant, James B. Clarage. Clarage, however, is not a party to the instant action.

[3]I note that Will County is in the Twelfth Judicial Circuit, and its courthouse is located in Joliet. The underlying occurrence took place in La Salle County, which is in the Thirteenth Judicial Circuit, and its courthouse is in Ottawa. The instant declaratory judgment action was also filed in La Salle County.

-11-

suit at issue today.

West American filed its declaratory judgment action on March 9, 2004, in the circuit court of La Salle County. West American attached to its complaint a copy of the commercial general liability policy issued by it to Yorkville, which required compliance with the following notice provisions as a condition of coverage:

"SECTION IV–COMMERCIAL GENERAL LIABILITY CONDITIONS

* * *

2. Duties In the Event of Occurrence, Offense, Claim or Suit.

a. You must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the 'occurrence' or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the occurrence or offense.

b. If a claim is made or 'suit' is brought against any insured, you must:

(1) Immediately record the specifics of the claim or 'suit' and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or 'suit' as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit';

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or

-12-

settlement of the claim or defense against the 'suit,' and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply."

West American contended that Yorkville breached these notice provisions by waiting nearly 28 months after a lawsuit was filed against it before providing the insurer with written notice. Accordingly, West American maintained that it had no obligation to defend Yorkville in that action.

Declaratory Judgment Testimony

During the trial on West American's declaratory judgment action, Yorkville's president, James Liggett, testified he first learned of the Kuzma matter in November 2000 when Wiegmann stated that Kuzma had accused him of making false statements about her. Liggett met with Kuzma, whom he described as being "very upset." After this meeting, Liggett informed Yorkville's attorney, Daniel Kramer, that Kuzma was "threatening a suit with the bank." After Liggett "investigate[d]" Kuzma's claims, he told her that he believed Wiegmann had done nothing improper. Liggett next heard of this matter 10 months later, when Yorkville and Wiegmann were named as defendants in the Will County defamation lawsuit filed by Kuzma in September 2001. Kramer, who was retained to defend the action, asked Liggett for a copy of Yorkville's directors and officers insurance policy, which was issued by an insurer other than West American. However, Kramer did not ask for a copy of the West American policy. Liggett stated that as the litigation with Kuzma progressed, Kramer "reported to us that he had contacted the insurance companies."

Liggett also testified regarding the alleged instances of "actual notice" of the Kuzma lawsuit to West American. Liggett stated that in "late 2001 or early 2002" he spoke with Richard Dickson, a principal of the Zeiter-Dickson Insurance Agency, who had placed the West American policy with Yorkville. According to Liggett, Dickson had "stopped in [the bank] as he often did," and in the midst of

-13-

"discussions about other things" Liggett told Dickson "there was something I needed to ask him about." Liggett told Dickson that "we were involved in this defamation lawsuit in Ottawa. That it was kind of a he said/she said sort of thing and that the [director and officer] insurance [policy] did not cover that type of suit. Then I asked if the [West American] policies would cover the suit." According to Liggett, Dickson replied "probably not," because "[m]ost all of those policies are written the same way anyway."

Liggett testified that he had a nearly identical, "in passing" conversation with Joel Ottosen, another agent of Zeiter-Dickson, during the same time frame–"late 2001, early 2002." Ottosen "stopped by" the bank and Liggett "told him I had an insurance question I wanted to ask him about." Liggett informed him that a defamation lawsuit had been filed against Yorkville, that it was not covered by the director and officer insurance, and asked whether the West American policy would provide coverage. According to Liggett, Ottosen replied with the exact words as had Dickson by stating "probably not," as "most all of those policies are written the same." Liggett did not direct Ottosen to notify West American as to the existence of the Kuzma lawsuit.

Liggett further testified that two conference calls occurred between himself, Ottosen and Kramer "in the second or third quarter of 2002," the first being made from his office and the second made from Kramer's office. Liggett told Ottosen that Kuzma's lawsuit was still pending, and asked again if the West American policy would provide coverage, to which Ottosen again replied "probably not."

According to Liggett, in January 2004 another insurance agency opined that the West American policy should cover the Kuzma suit. This prompted Liggett to call Ottosen on January 15, 2004, and ask again about coverage under that policy. According to Liggett, Ottosen stated, " 'I'll report it' or something to that effect."

Finally, Liggett testified regarding meetings of Yorkville's board of directors during the fall of 2002. It was not until September 2002 that Liggett first informed Yorkville's board about the Kuzma litigation. Liggett stated that he prepared the minutes of the board meetings, and he read into the record a portion of the minutes of the September 2002 meeting which first referenced the Kuzma lawsuit:

"President Liggett reported to the Board that Attorney Cheryl Kuzman [*sic*] of Ottawa was suing the bank, Ben Wiegmann and James Clarage in a counter suit ***. The basis of the suit is alleged derogatory comments made by Mr. Wiegmann *** [and the] remarks have been denied ***."

Liggett also read a relevant portion of the minutes from the November 2002 Yorkville board meeting, which simply stated that there were "additional legal expenses involved with the Clarage–Yorkville National Bank–Kuzman [*sic*] law suit." Liggett stated that Richard Dickson was a member of the Yorkville board and was present at both the September and November 2002 meetings. However, insurance coverage of the Kuzma lawsuit was not discussed during any of the board meetings.

Daniel Kramer's testimony at trial often conflicted with that of Liggett. Although Liggett told him in November 2000 that Kuzma came to his office and that she was upset, he did not also tell him that she threatened legal action. After Kuzma filed suit, Kramer asked Liggett for copies of Yorkville's insurance policies and was given only the policy providing director and officer coverage. Kramer tendered a defense to that insurer within 60 to 90 days after the bank was sued, but coverage was declined because that policy had an exclusion for intentional torts. Kramer was initially unaware of the West American policy until Liggett mentioned it to him in early 2002. At no time did Kramer independently contact West American about coverage of the Kuzma matter.

Kramer's testimony regarding the alleged instances of "actual notice" also largely conflicted with that of Liggett. Kramer stated his first contact with the Zeiter-Dickson agency was by way of conference calls placed from Liggett's office in 2001 or 2002. During these calls, Liggett asked Ottosen whether Yorkville had coverage under the West American policy. Ottosen asked Liggett for a copy of the Kuzma complaint, and Liggett replied that he would get it to him "right away." Because they did not hear back from Ottosen, Liggett and Kramer placed another call to him in late 2002 from Liggett's office. Ottosen stated he had forwarded the claim to West American and that they would hear from a West American attorney. Kramer testified that he prepared no documents to memorialize the conversations with Ottosen.

-15-

The testimony of both Liggett and Kramer further conflicted with that of Ottosen, who testified on behalf of West American. Ottosen did not receive calls from Liggett and Kramer in 2001 and/or 2002 regarding the Kuzma matter. Instead, his first discussion regarding that action occurred on January 15, 2004, when Wiegmann called to inquire whether his personal homeowner's insurance policy could provide coverage. Ottosen advised Wiegmann that if the lawsuit arose in the course of his employment as Yorkville's vice president, it was likely that he was covered under the West American policy. Ottosen called Liggett the following day and told him that if the lawsuit arose out of Wiegmann's bank employment it should be covered. When Liggett replied, "they say we are not covered," Ottosen asked who informed him that there was no coverage under the West American policy. Liggett responded: "I don't know. Kramer is handling it." Ottosen asked Liggett to speak with Kramer, obtain that information, and then contact him again. After calling Liggett, Ottosen asked his secretary to contact Kramer's office to obtain a copy of the lawsuit, and he then looked up Yorkville's policy in the agency's old files. After concluding that there was potential coverage, he called Liggett back and told him that although it would be a late submission, once he received a copy of the Kuzma complaint he would submit a claim to West American, which he did on January 19, 2004. Ottosen's testimony was supported by documentation of his actions in connection with the filing of the claim.

Circuit Court's Findings and Ruling

The circuit court found it undisputed that although Liggett was aware of potential litigation from Kuzma in November 2000, Liggett "satisfied himself that this was no big deal." Therefore, he did not notify West American of a potential claim at that time. When Kuzma filed suit in September 2001, Liggett notified Kramer, who began the defense. Yet, despite the insurance policy's notice requirements, the court found that a copy of Kuzma's complaint was not tendered to the Zeiter-Dickson agency or to West American.

The circuit court further found it undisputed that a conversation between Liggett and Dickson took place at the bank. However, the court determined that the "only contents of the conversation was that there was a lawsuit in Ottawa, kind of a he said/she said thing on

-16-

defamation. No testimony as to when this defamation took place. There was no copy of the complaint. There was no request for any of that information. It was sort of an in passing conversation, do we have any coverage on that."

In addition, the circuit court found that information regarding the Kuzma matter was presented to Yorkville's board of directors on two occasions, and both times Dickson was in attendance in his capacity as a director. However, because the evidence consisted only of what was set forth in the minutes, the court further found that "[t]he minutes don't contain any information about where the suit was filed, when the incident allegedly took place, who the parties to the lawsuit were."

Finally, with respect to Liggett and Kramer's testimony regarding conversations with Ottosen, the court believed that "at some point Mr. Liggett said something to Mr. Ottosen but the content of which is very hard to determine, [as is] the context of when it was [said]." The court, however, flatly rejected the testimony of Liggett and Kramer that they participated in two conference calls with Ottosen, finding that their statements were not credible and that these calls did not take place. The court found support for this conclusion in the fact that when Wiegmann contacted Ottosen in January 2004 regarding whether his personal homeowner's policy could provide coverage for the Kuzma lawsuit, Ottosen immediately took action and documented the steps taken in the process. Ottosen's quick actions with regards to Wiegmann's inquiry stood in contrast to the testimony of Liggett and Kramer that although Ottosen took "phone calls from the bank president and a lawyer" he did "not even document that *** and ignore[d] it completely." The circuit court judge concluded, "I don't find that to be credible."

The circuit court then applied the law to these findings of fact. Although the court acknowledged that "a gap" existed in the conversation between Liggett and Dickson to the extent that Dickson was "not given all the details" of the Kuzma lawsuit, the court nevertheless held that Liggett's conversation with Dickson was sufficient to place West American on "actual notice" that a lawsuit had been filed against Yorkville, providing it with adequate information to locate and defend the action. When this conversation was combined with the additional information regarding the Kuzma

-17-

lawsuit provided during the Yorkville board of directors meetings that Dickson attended, the court concluded that "[t]he totality of the situation is that there is notice." Although the court found "some evidence" of prejudice to West American due to notice being given to it after discovery was closed and the case was set for trial, because the Kuzma action had been mentioned several times and Yorkville was told that there was no coverage, "the fact that they were late reporting it, I don't know that that's unreasonable." Thus, the circuit court held that West American owed a duty to provide coverage to Yorkville and directed West American to pay stipulated damages in the amount of $1,982,778.78.

ANALYSIS

In *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303 (2006), we recently reaffirmed that an insured's breach of a policy's notice provision "will defeat the right of the insured party to recover under the policy." *Country Mutual*, 222 Ill. 2d at 312, citing *Simmon v. Iowa Mutual Casualty Co.*, 3 Ill. 2d 318, 322-23 (1954). This result is grounded in the principle that notice clauses "impose valid prerequisites to insurance coverage" (*Country Mutual*, 222 Ill. 2d at 311, citing *Barrington Consolidated High School v. American Insurance Co.*, 58 Ill. 2d 278, 281 (1974); *Imperial Fire Insurance Co. of London v. Coos County*, 151 U.S 452, 38 L. Ed. 231, 14 S. Ct. 379 (1894)) and is rooted in decades of precedent, which has long recognized:

> "Contracts of insurance are contracts of indemnity upon the terms and conditions specified in the policy ***, embodying the agreement of the parties. *** The terms of the policy constitute the measure of the insurer's liability, and in order to recover, the assured must show himself within those terms; and if it appears that the contract has been terminated by the violation on the part of the assured, of its conditions, then there can be no right of recovery. The compliance of the assured with the terms of the contract is a condition precedent to the right of recovery." *Imperial Fire Insurance Co.*, 151 U.S. at 462, 38 L. Ed. at 235, 14 S. Ct. at 381.

Based upon this rationale, our courts have repeatedly held that

notice provisions in an insurance policy are not merely technical requirements but, rather, conditions precedent to the triggering of the insurer's contractual duties. *Northbrook Property & Casualty Insurance Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 464 (2000); see also, *e.g.*, *Aetna Casualty & Surety Co. of Illinois v. Allsteel, Inc.*, 304 Ill. App. 3d 34, 41 (1999); *Kerr v. Illinois Central R.R. Co.*, 283 Ill. App. 3d 574, 582 (1996); *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 311 (1994); *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.*, 138 Ill. App. 3d 574, 581 (1985); *International Harvester Co. v. Continental Casualty Co.*, 33 Ill. App. 2d 467, 471 (1962). These decisions note the several important purposes served by notice provisions, which include "afford[ing] the insurer an opportunity to make a timely and thorough investigation and to gather and preserve possible evidence." *Barrington Consolidated High School*, 58 Ill. 2d at 281; see also P. Kalis, T. Reiter & J. Segerdahl, *Policyholders Guide to the Law of Insurance Coverage* §24.02(A), at 24–3 (1997) ("[t]imely notice ensures that an insurer will have the opportunity to interview witnesses while they are available, and to marshall evidence relevant to the defense of the underlying action before it is lost or destroyed"). In addition, a notice-of-suit provision allows the insurer to "control the litigation," including options for settlement.14 Couch on Insurance §199.84, at 199–140 (3d ed. 1999).

Notice provisions, like those here, generally provide that an insured must give an insurer notice "as soon as practicable." The notice provision in Yorkville's policy is identical to that found in *Country Mutual*, where we explained that "[a] policy condition requiring notice '[a]s soon as practicable' is interpreted to mean 'within a reasonable time,' " and held that "[w]hether notice has been given within a reasonable time depends on the facts and circumstances of each case." *Country Mutual*, 222 Ill. 2d at 311-12, quoting *Barrington Consolidated High School*, 58 Ill. 2d at 282. Thus, for an insured to satisfy this type of notice provision, two requirements must be met: first, "notice" must be provided to the insurer within the meaning of the policy; and, second, such notice must be timely. See *Country Mutual*, 222 Ill. 2d at 311-12.

Although the majority recites many of these well-settled legal principles at the outset of its analysis (see slip op. at 5-6), it fails to

apply them to the instant appeal. For example, although the majority readily acknowledges that "[i]nsurance policy notice provisions impose valid prerequisites to insurance coverage" (slip op. at 5), it fails to set forth all of the relevant notice provisions contained within the policy and does not construe these provisions under the very rules of analysis contained in its opinion. I submit that if the majority actually performed such an analysis, it would be compelled to reach a contrary result.

The majority states that in construing an insurance policy, "we must ascertain and give effect to the intentions of the parties, *as expressed in the policy language.*" (Emphasis added.) Slip op. at 5. As the majority further observes, we must "giv[e] effect to every provision," keeping in mind that "[u]nambiguous words in the policy are to be given their plain, ordinary, and popular meaning." Slip op. at 5. Under this framework, the logical next step is to examine the words used in the policy provisions.

Pursuant to section IV(2)(a) of the policy, the insured must "see to it that [West American is] notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." Once this provision is triggered, the policy further requires the insured to transmit several specific items of information to the insurer: (1) "how, when and where the 'occurrence' or offense took place," (2) "the names and addresses of any injured persons and witnesses," and (3) "the nature and location of any injury arising out of the occurrence or offense."

The majority neither references these policy provisions nor construes them under the analytical framework set forth in its opinion, despite its clear statement that the language of the policy controls. See slip op. at 5 ("we must ascertain and give effect to the intentions of the parties, as expressed in the policy language"). It is my view that, pursuant to the plain language of this provision, once Kuzma contacted Liggett in November 2000 regarding her claim that Wiegmann had made false statements about her and that it appeared that a future lawsuit was possible, Yorkville was required to provide West American with information regarding this "occurrence ***

-20-

which may result in a claim."[4] The policy mandated Yorkville to notify West American of the Kuzma matter "as soon as practicable"[5] and to provide West American with specific information regarding the genesis of this occurrence. Yorkville, however, failed to comply with any of these policy provisions.

Section IV(2)(b) is the second relevant notice provision within the policy and provides that when a "claim is made or 'suit' is brought against any insured," the insured must "immediately record the specifics of the claim or 'suit' and the date received," and notify West American "as soon as practicable." Yorkville was also required to "see to it that [West American] receive written notice of the claim or 'suit' as soon as practicable."

Again, although the majority states that effect must be given to the intent of the parties as expressed through the language of the policy, the majority fails to construe this provision using this analytical framework. It is my view that, under the plain language of the provision, Yorkville was required to "immediately"[6] record the specifics of the lawsuit and the date received, and to provide written notification to West American of this event "as soon as practicable." I submit that the policy required Yorkville to have performed these actions shortly after the time Kuzma filed her complaint in September 2001. Yorkville, however, failed to comply with any of these policy provisions.

Finally, under section IV(2)(c) of the policy, the insured is required to "immediately" send to West American "copies of any demands, notices, summonses or legal papers received in connection

---

[4]I note that in the course of its opinion, the majority itself states that "Yorkville was aware in November 2000 of the potential for a lawsuit." Slip op. at 7.

[5]As stated, we have previously construed this policy language to mean "within a reasonable time" based upon the facts and circumstances of each case. *Country Mutual*, 222 Ill. 2d at 311-12.

[6]The use of the term "immediately" indicates that this action was to be taken "instantly," and "without delay." See Black's Law Dictionary 816 (9th ed. 2009).

with the claim or 'suit,' " to "authorize [West American] to obtain records and other information," to "cooperate with [West American] in the investigation or settlement of the claim or defense against the 'suit,' " and to "assist [West American] *** in the enforcement of any right against any person or organization which may be liable to the insured because of injury *** to which this insurance may also apply."

Again, the majority fails to apply its purported analytical framework by not giving effect to the intention of the parties as expressed in the language of this policy provision. It is my view that, pursuant to the provision's plain language, Yorkville had the obligation to "immediately" send West American copies of any legal papers related to the Kuzma action, including the complaint. In addition, Yorkville was required to authorize the insurer to obtain records and other information connected to this matter and to cooperate with the investigation or settlement of the suit. Again, Yorkville failed to comply with any of these policy provisions.

Thus, upon review of the plain and unambiguous language of the notice provisions contained in the instant policy, it is apparent that Yorkville breached each and every reporting obligation it agreed to as a condition of coverage. Had Yorkville fulfilled the policy notice requirements, West American would have been in receipt of pertinent and timely information regarding the Kuzma matter, including the contact information for the parties, the basis for the filing of the lawsuit, and the correct case caption, file number and location of the action. As Justice Schmidt observed in his special concurrence below, "[m]any of the insurance coverage notice cases involve swearing contests between the insurance carrier and its insured as to whether oral notice was given," and the "obvious intent" of a written notice provision "is to avoid these 'he said-she said' coverage disputes." 388 Ill. App. 3d at 781-82 (Schmidt, J., specially concurring). Indeed, this case provides a textbook example of the importance of an insured's adherence to the written notice requirement, as Yorkville's compliance would have allowed West American to perform a timely investigation, to gather and preserve evidence, and to allow an informed decision as to whether to settle or litigate the matter. Due to Yorkville's failure to comply with its policy obligations, West American was deprived of these options, and this litigation ensued.

It is therefore deeply troubling that despite the majority's statements that the language of the policy controls and that an insured's compliance with policy notice provisions is a "valid prerequisite" to coverage, my colleagues fail to apply these well-settled principles to the matter at bar. As a result, the majority does not answer the pivotal question of whether Yorkville complied with the notice provisions as set forth in the policy. Instead, my colleagues overlook the plain and unambiguous language of the notice provisions and, in an apparent effort to salvage Yorkville's claim, address the subsequent and separate question of whether the notice given was reasonably timely. I submit that by departing from the framework set forth at the outset of the "Analysis" portion of its opinion, the majority tacitly undercuts our precedent absent discussion or support for doing so, and its opinion will engender confusion among the bench and bar as to the continued validity of these previously settled principles.

Departing from our precedent, the majority's analysis in support of upholding Yorkville's coverage claim consists solely of an application of five factors set forth by this court in *Country Mutual*, which provide guidance in determining whether notice given to an insurer is made within a reasonable time. The dispute between the parties in *Country Mutual* centered on whether notice provided to the insurer 20 months after suit was filed against the insured was unreasonably late, thereby relieving the insurer of its duty to defend the insured. *Country Mutual*, 222 Ill. 2d at 307-08. The narrow legal issue addressed in *Country Mutual* was whether an insurer, before being relieved of its duty to defend, must prove that it was prejudiced by the delay in receiving notice. We clarified that several factors may be considered in assessing whether timely notice is given in a particular case, including whether the insurer was prejudiced; the specific language of the policy's notice provision; the insured's sophistication in commerce and insurance matters; the insured's awareness of an event which may trigger insurance coverage; and the insured's diligence in ascertaining whether policy coverage is available. *Country Mutual*, 222 Ill. 2d at 313. Significantly, *Country Mutual* held that a lack of prejudice on the part of the insurer does not foreclose an insurer's contention that notice was untimely (*Country Mutual*, 222 Ill. 2d at 316-17), and reaffirmed our long-established

holding in *Simmon* that the presence or absence of prejudice to an insurer is only *one factor* to consider. *Country Mutual*, 222 Ill. 2d at 317.

Unlike the matter at bar, there was no dispute in *Country Mutual* concerning the adequacy of the notice provided to the insurer or whether the insured had satisfied its obligations to transmit to the insurer the information specified under the policy. Thus, *Country Mutual* is factually inapposite to the matter before us and provides no guidance as to the important question presented in the instant appeal: whether Yorkville complied with the notice requirements of the policy. The majority nevertheless takes the unprecedented step of employing the five *Country Mutual* factors intended to gauge the timeliness of notice as its sole basis for reversing the judgment of the appellate court and holding that Yorkville is entitled to coverage. Because the majority adopts this analysis absent discussion or explanation for departing from our settled precedent, I cannot join its opinion.

Moreover, *even if* I agreed with the majority that this analysis is appropriate, I still could not join the majority opinion based upon my belief that the majority errs in its application of these factors. For example, in assessing whether notice was provided to the insurer within a reasonable time, *Country Mutual* directs that the specific language of the policy's notice provision be considered. In reviewing this factor, the majority states that "the specific language in the Policy's notice provision does not aid in our reasonableness analysis because it does not identify a specific time frame for giving notice" (slip op. at 6) apart from directing that the written notice be sent "as soon as practicable" and that copies of any legal papers be sent "immediately." First, I note that this is the majority's *sole* reference within its analysis to the language of the policy's notice provisions, despite its pronouncement earlier in its opinion that the plain language of the policy controls and that effect should be given to every provision to fulfill the intent of the parties. Second, I disagree with the majority's conclusion that these terms "do[] not aid" in the reasonableness analysis; to the contrary, they indicate that an insured must satisfy these provisions with the goal of providing the insurer with notice at the earliest possible moment under the facts and circumstances presented.

Equally problematic is the majority's discussion of the *Country Mutual* factor that directs a court to assess whether the insured was diligent in ascertaining the availability of policy coverage. Relying upon the haphazard encounter between Liggett and Dickson at the bank "in late 2001 or early 2002" and the vague statements made during that "in passing" conversation, the majority concludes that Yorkville displayed diligence in ascertaining whether the policy would cover the Kuzma lawsuit. In further support, the majority quotes from the circuit court's finding that during this conversation, Liggett told Dickson "that we were involved in this defamation lawsuit in Ottawa. That it was kind of a he said/she said sort of thing," and that Dickson responded by stating that this matter would "[p]robably not" be covered under the policy. See slip op. at 8. The majority concludes that "[a]fter being informed by its agent that the Policy probably did not cover the lawsuit, Yorkville reasonably believed that sending written notice to its insurer would be futile." Slip op. at 8.

The majority's analysis on this point is flawed in several respects. First, the record is devoid of support for the majority's conclusion that Yorkville was of the belief "that sending written notice would be futile." Second, I note that the majority relies upon Dickson's reply that the policy "*probably*" would not cover the vague factual scenario outlined by Liggett during their informal exchange. I submit that Dickson's response is not a definitive denial of coverage, and that his offhand statement left the question open for further discussion. Thus, the majority factually errs when it subsequently states that Dickson informed Yorkville that "the policy afforded *no coverage.*" (Emphasis added.) Slip op. at 8. Accordingly, its conclusion that "[a] reasonably prudent party in the position of the insured would not have continued to pursue coverage under the policy having been informed *** that the policy afforded *no coverage*" (emphasis added) (slip op. at 8) is called into question. Finally, the majority's determination that Yorkville displayed diligence is further undercut by its holding earlier in its opinion that Yorkville is a "sophisticated" insured, owing to the fact that it is a bank with experience in the areas of commerce and insurance. Slip op. at 7. Given that Yorkville is skilled in business and insurance matters, is represented by counsel, and also is subject to layers of state and federal regulation as a bank, I find it patently

-25-

unreasonable for such an entity to rely upon an in-passing, off-the-cuff informal conversation and an equivocal response as the basis for its failure to formally pursue the coverage question and leave itself open to potential liability exposure. Although the majority relies upon a series of appellate court decisions for the proposition that "[c]ourts have recognized that an insured's reasonable belief of noncoverage under a policy may be an acceptable excuse for the failure to give timely notice, even where the delay is lengthy" (slip op. at 7-8), none of these cases involved a sophisticated insured such as Yorkville, and they are therefore inapposite.

As a final matter, the majority examines the *Country Mutual* factor that questions whether West American suffered prejudice as a result of the 28-month delay in written notice. The majority notes that the circuit court held that West American received "actual notice" of the Kuzma lawsuit in late 2001 or early 2002 as a result of the "in-passing" conversation between Liggett and Dickson, as well as the mention of the matter during two Yorkville board meetings. Agreeing with the circuit court's ruling that under our prior decision in *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 329 (1998), Yorkville had "actual notice" of the Kuzma lawsuit in that it had sufficient information to "locate and defend" that action, the majority concludes that West American suffered no prejudice as a result of the 28-month delay.

Not only do I disagree with the majority's conclusion, but I also am concerned that the majority today expands the principle of "actual notice" as it was used in *Cincinnati* without addressing the differences between that case and today's case: there, notice provisions were not at issue, and policy defenses were not raised by the parties to that action.

In *Cincinnati*, a construction accident resulted in a suit for personal injuries against several subcontractors, including Baird, which was defended under a policy issued by Cincinnati Companies. A second subcontractor, B&D, was defended by West American. Unbeknownst to Baird, it was an additional insured under B&D's West American policy; therefore, it had no reason to tender a defense to West American. However, on the eve of trial, B&D disclosed that Baird was an additional insured on the West American policy. Baird then tendered its defense to West American, which rejected Baird's

tender. *Cincinnati*, 183 Ill. 2d at 319-21.

We held that the insurer could not decline coverage on the basis that there had not been an official tender of defense by the newly discovered insured when it already had "actual notice" of the action because it had been actively defending the identical lawsuit for another insured, B&D. *Cincinnati*, 183 Ill. 2d at 329-30. Defining "actual notice" as " 'notice sufficient to permit the insurer to locate the suit and defend it' " (*Cincinnati*, 183 Ill. 2d at 324, quoting *Long v. Great Central Insurance Co.*, 190 Ill. App. 3d 159, 168 (1989)), we concluded that the insurer *actually knew* of the lawsuit at issue for three years, as it had been defending B&D throughout the pendency of that action. *Cincinnati*, 183 Ill. 2d at 330. Accordingly, we held that an exception to the tender requirement exists–and the insurer's duty to defend was therefore triggered–where it was unmistakable that the insurer was already aware of the suit. In arriving at this holding, we explicitly stated that because neither party invoked the specific terms of the policy, "policy defenses have not been a factor in our decision." *Cincinnati*, 183 Ill. 2d at 323 n.1.

Clearly, *Cincinnati* is neither factually nor legally on point with this case. The insurer in *Cincinnati* knew of the lawsuit because it was already a party to that action; hence the term "actual notice." The insurer's participation in the defense of the suit thereby foreclosed any question regarding its knowledge of that litigation. In contrast, West American was not a participant in the Kuzma action and, therefore, the same level of knowledge cannot be attributed to it. Further, unlike in *Cincinnati*, the insurer here is vigorously raising policy defenses, arguing that the language of the policy controls, and relying upon long-settled precedent that an insured's compliance with notice provisions is a prerequisite to insurance coverage. The majority's application of *Cincinnati* to this case will cause confusion to both bench and bar, as today's holding contradicts long-held notions in Illinois that notice provisions are not simply technical requirements to be overlooked but, rather, conditions precedent to coverage.

Furthermore, the majority's holding that Yorkville provided West American with "actual notice" to allow it to "locate and defend" the Kuzma lawsuit (slip op. at 9-10) is unsupported by the record. The majority summarily concludes that the circuit court correctly

-27-

determined that Yorkville provided "actual notice" to West American of the Kuzma lawsuit, thereby fulfilling its notice responsibilities under the policy. The majority's holding is premised only upon the circuit court's finding that Liggett and Dickson had a conversation about the Kuzma action in late 2001 or early 2002, combined with the brief mention of the Kuzma lawsuit during the September and November 2002 Yorkville board meetings at which Dickson was present.

I note, however, that as part of these findings, the circuit court also found that the conversation informally occurred "in passing," and determined that the "only contents of the conversation was that there was a lawsuit in *Ottawa*, kind of a he said/she said thing on defamation" (emphasis added), with no reference to a time frame when this defamation took place and no production of a copy of the complaint.[7] Even while candidly acknowledging that "no details were given as to when the alleged defamation took place or where the lawsuit was filed" (slip op. at 10), the majority nevertheless concludes that West American was provided with sufficient information to locate and defend the lawsuit. I strongly disagree.

Since the Kuzma action was filed in *Joliet*, and *not* filed in *Ottawa*–as was implied by Liggett's statement to Dickson–and as it was mentioned simply "in passing," it is difficult to understand how the short informal exchange between Liggett and Dickson would have provided West American with the information necessary "to locate and defend the lawsuit." Under the majority's view, West American should have been able to simply contact the courthouse in Ottawa–which is in the Thirteenth Judicial Circuit–and obtain a copy of the Kuzma lawsuit. Of course, such action would have been futile, as Kuzma's suit was filed over 50 miles away in the circuit court of Will County–which is in the Twelfth Judicial Circuit–and the paperwork would have been located in the Joliet courthouse. There is nothing in the record to show that Yorkville ever informed Dickson and/or West American that Kuzma's action was filed in a different

---

[7]Although the majority relies upon Liggett's account regarding this encounter, I note that the circuit court specifically found that large portions of his testimony were not credible.

city, county and judicial circuit prior to sending West American the complaint in January 2004.

With respect to the minutes of the Yorkville board meetings, the circuit court found that "[t]he minutes don't contain any information about where the suit was filed, when the incident allegedly took place, who the parties to the lawsuit were." Given that specific factual finding, I question how the information in the minutes would have provided West American with the ability "to locate and defend the lawsuit," particularly in light of the fact that the minutes also misidentify Sheryl Kuzma as "Cheryl Kuzman."

My review of the record establishes that the circuit court correctly determined that Liggett believed that the Kuzma matter would simply go away, to the extent that he "satisfied himself that this was no big deal." The circuit court found that this belief accounted for Liggett's failure to notify West American of a potential claim after meeting with Kuzma in November 2000, even though section IV(2)(a) of the West American policy requires that the insured "must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." Despite this reporting obligation, Liggett made no contact with West American at that time, even though Kuzma had "threaten[ed] a suit with the bank." This may also explain why Liggett did not inform Yorkville's board of directors about the Kuzma litigation until one year had passed from the date it was filed, even though Yorkville had the potential for significant exposure if found liable. In addition, this belief may also account for the fact that, even when the litigation was finally announced to the board, Liggett downplayed its significance by including very little about the action in the minutes of the meeting.

In sum, it is my belief that under our well-established precedent, Yorkville breached the plain and unambiguous language of each and every notice provision contained within the policy. Because notice provisions are not merely technical requirements but, rather, conditions precedent to the triggering of an insurer's contractual duties, Yorkville therefore is not entitled to coverage under the policy. Although today's opinion pays lip service to these long-held principles of insurance law, the effect of the majority's ruling undercuts this precedent and creates confusion for both bench and bar.

By ignoring the settled rules of insurance policy construction and, instead, focusing exclusively on the timeliness factors set forth in *Country Mutual*, the majority redirects the focus of analysis away from compliance with policy provisions to an unworkable and problematic case-by-case examination, requiring swearing contests between the insurer and insured as to whether and when notice was provided. The majority's opinion will undoubtedly engender additional litigation and place further strain on our courts to sort through these "he said-she said" situations in lieu of holding insureds to the terms of their policies.

In addition, today's opinion summarily extends the principle of "actual notice" and, by doing so, effectively overrules decades of precedent establishing that notice provisions are conditions precedent to coverage under a policy and are not merely technical requirements. Under this holding, virtually any insured may now prevail on a claim that because the insurer was provided with "actual notice"–in whatever haphazard way and despite that information being incorrect–the plain and unambiguous language of the notice provisions contained within the policy are irrelevant. This holding essentially writes out of the West American policy its detailed requirements regarding provision of notice to the insurer, *none* of which were complied with by Yorkville.

For the foregoing reasons, I cannot join the majority opinion.