In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-2290

M.G. SKINNER AND ASSOCIATES INSURANCE AGENCY, INC. AND
WESTERN CONSOLIDATED PREMIUM PROPERTIES, INC.,

*Plaintiffs-Appellants*,

*v.*

NORMAN-SPENCER AGENCY, INC.,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-3481 — **Robert W. Gettleman**, *Judge*.

———————————

ARGUED JANUARY 14, 2016 — DECIDED JANUARY 4, 2017

———————————

Before FLAUM and RIPPLE, *Circuit Judges*, and PETERSON,
*District Judge*.*

PETERSON, *District Judge*. This case arises out of a complex
insurance transaction that ended badly because the sup-
posed insurance turned out to be a complete fraud. Despite

———————————

* Of the Western District of Wisconsin, sitting by designation.

the complexities of the broader transaction and the litigation that it spawned, this appeal presents, essentially, a single question: whether Norman-Spencer Agency, Inc., an Ohio insurance agency, owed a duty to M.G. Skinner and Associates Insurance Agency, Inc. and Western Consolidated Premium Properties, Inc., two entities that had engaged a chain of sub-brokers to procure insurance for a vast collection of real property.

M.G. Skinner and Associates and Western Consolidated Premium Properties, plaintiffs-appellants here, contend that defendant-appellee Norman-Spencer Agency was one of the sub-brokers in the chain, and thus it owed them a duty of reasonable care in procuring the insurance, which Norman-Spencer Agency breached by failing to point out obvious signs that the ultimate provider of the insurance was dishonest. But according to Norman-Spencer Agency, it was never asked and it never agreed to procure insurance for plaintiffs-appellants, and thus it owed them no duty. The district court agreed with Norman-Spencer Agency, and in separate orders, granted summary judgment in its favor, against each plaintiff-appellant. We agree with the district court and affirm both orders.

## I. Background

### A. Factual background

Appellee Norman-Spencer Agency, Inc., which we will call Norman-Spencer, is an Ohio-based insurance agency. We will leave Norman-Spencer to the side for the moment and begin the story with appellants.

Appellant Western Consolidated Premium Properties, Inc. (WCPP), a California corporation, is a risk purchasing

group through which the owners or managers of commercial property can purchase insurance. Appellant M.G. Skinner and Associates Insurance Agency, Inc. (MGSA), also a California corporation, is an insurance broker that acts as the program administrator for WCPP. Michael Skinner is the sole shareholder of both WCPP and MGSA. WCPP and its affiliated broker MGSA represent more than 600 commercial properties, including office buildings, shopping centers, and residential complexes. The total insured value of these properties is nearly $3.5 billion.

In late 2011, MGSA sought renewal coverage for the WCPP properties. MGSA contracted with MC Risk Services, LLC (MC Risk), a Texas insurance broker specializing in habitational and commercial real estate, to procure the renewal insurance for WCPP. Jed Morash was co-owner of MC Risk. Insurance placements as large as this one commonly involve sub-brokers. In this case, MC Risk engaged National Condo & Apartment Insurance Group LLC (NCAIG), an Ohio insurance broker. NCAIG's sole member is Kenneth Littlejohn. NCAIG had previous insurance-placement experience with Michael A. Ward and his company JRSO, LLC. By November 1, 2011, Littlejohn and Morash intended to place the WCPP coverage with JRSO. The chain of brokers was thus complete: from MGSA, to MC Risk, to NCAIG, and ultimately to Ward and JRSO, who would provide the insurance.

Except that Ward and JRSO did not provide insurance. As it turns out, Ward had created a fictitious insurance policy for WCPP that was not actually backed by a legitimate insurer. Ward was convicted of wire fraud, sentenced to 10 years in prison, and ordered to pay more than $9 million in restitution to various victims of his fraud, including WCPP.

So that's the main arc of the story. To fit Norman-Spencer in, we must backtrack and add some details.

One of the property groups in the WCPP program was Myan Management Group, representing dozens of commercial and multi-unit residential properties in the southwest. The Myan properties had a history of losses, and Morash (at MC Risk) thought that cheaper coverage could be obtained by splitting the Myan properties off from the main WCPP group. So, with Littlejohn's advice, MGSA and MC Risk agreed to place Myan Management directly with JRSO for insurance. The Myan Management coverage was bound effective October 1, 2011, the premium was invoiced on October 4, and paid on November 3. But this coverage was also fictitious.

In previous deals in which NCAIG had worked with Ward and JRSO, they had used Mulberry Insurance Services as program administrator. But Mulberry's work had been unsatisfactory, so NCAIG's Littlejohn recommended to Ward that he replace Mulberry with Norman-Spencer as program administrator.

Ward, Littlejohn, and Norman-Spencer's president, Brian Norman, met on November 11, 2011, to discuss Norman-Spencer's potential retention as the JRSO program administrator. Following that meeting, Norman drafted a document titled "Memorandum of Understanding" that purported to outline the agreement between Ward and Norman. Among the terms of this agreement was that Norman-Spencer would issue a backlog of approximately 64 already-bound policies in exchange for $25,000, and that going forward, Norman-Spencer would underwrite and issue policies for the JRSO program. The memorandum of understanding was never

signed, but Norman-Spencer was paid the $25,000 and began issuing the backlogged policies. The 64 backlogged policies included Myan Management's coverage, but not WCPP's.

Norman pushed to be involved in more business with Ward. But whatever the terms of Ward and Norman-Spencer's November 11, 2011, agreement, Ward did not allow Norman-Spencer to be involved in the WCPP placement. In December 2011, Norman and Littlejohn (for NCAIG) discussed Norman-Spencer accepting a reduced commission to convince Ward to allow Norman-Spencer into the WCPP placement. But Ward never let Norman-Spencer into the deal. Littlejohn said this was because Ward thought the margin would be "too thin" if Norman-Spencer earned a commission on the placement.

Along the way, Norman became aware of facts that MGSA and WCPP contend should have been "red flags" showing Ward's lack of trustworthiness. In November 2011, Norman discovered an order of conservation issued against Ward and JRSO by the Circuit Court of Cook County that Norman thought could cause concern about Ward's ability to bind coverage. Norman knew that Ward worked out of his home following the order of conservation's provision confiscating JRSO's property. When Norman asked Ward for a copy of Ward's reinsurance agreement, Ward delayed for over a month before producing a signed agreement, and even then, that agreement had irregularities that might have made it suspicious. But Norman-Spencer did not inform WCPP or MGSA about these problems.

In December 2011, MC Risk gave WCPP a quote for the renewal coverage on JRSO letterhead, stating that Ward and JRSO had obtained coverage for WCPP. WCPP accepted the

quote and paid more than $1.3 million as an initial install-
ment of the premium. In the process, at least four insurance
proposals were prepared for the WCPP coverage under the
JRSO program. The various proposals were prepared on the
letterheads of MC Risk, NCAIG, North American Capacity
Insurance Company, and JRSO. None of the proposals or any
pricing information came through Norman-Spencer. MC
Risk and NCAIG each received a commission from the pre-
mium; Norman-Spencer did not.

After Ward's fraud was discovered, the Myan Manage-
ment coverage was reincorporated into the WCPP place-
ment. MGSA and WCPP ultimately procured new insurance
that cost more than $2 million more than the original, fraud-
ulent insurance.

## B.  Procedural background

WCPP and MGSA filed a lawsuit in the United States
District Court for the Northern District of Illinois against MC
Risk, NCAIG, Norman-Spencer, JRSO, and Ward. All claims
except those against Norman-Spencer were resolved through
default or settlement.[1] WCPP and MGSA each brought
claims for negligence and breach of fiduciary duty against
Norman-Spencer, alleging that Norman-Spencer should
have alerted them to the "red flags" it had uncovered that
suggested that Ward and JRSO were untrustworthy.

---

[1] MGSA and WCPP obtained entries of default against Ward and
JRSO for their failure to appear and defend. MGSA and WCPP reached a
settlement agreement with MC Risk and NCAIG in January 2014. MC
Risk and NCAIG assigned their respective cross-claims for contribution
and indemnity against Norman-Spencer to MGSA and WCPP.

Norman-Spencer moved for summary judgment twice, first with regard to WCPP's claims, and later with regard to MGSA's claims. The district court granted Norman-Spencer's motion for summary judgment regarding WCPP's claims on February 25, 2015. The district court concluded that Norman-Spencer did not owe a duty to WCPP under the Illinois Insurance Placement Liability Act (IIPLA), 735 ILCS 5/2–2201, because neither WCPP nor any broker in the procurement chain ever requested Norman-Spencer's assistance with that placement. The court granted Norman-Spencer summary judgment on WCPP's breach of fiduciary duty claim for similar reasons, concluding that Norman-Spencer could not be liable under that theory because it did not participate in the placement or receive any WCPP funds from that placement.

The district court granted summary judgment in favor of Norman-Spencer on MGSA's claims on May 13, 2015, concluding in part that MGSA was not an "insured" on the Myan Management policy for purposes of the IIPLA. The court granted summary judgment in favor of Norman-Spencer on MGSA's breach of fiduciary duty claim, concluding that because MGSA was not the "insured" on the Myan Management policy and did not make any payment toward that policy, Norman-Spencer could not have wrongly retained any MGSA funds.[2]

---

[2] In both orders, the district court granted Norman-Spencer summary judgment on MC Risk's and NCAIG's cross-claims for contribution and indemnity that had been assigned to appellants, because Norman-Spencer was not liable on any of appellants' direct claims.

## II. Discussion

### A. Standard of review

We review the district court's opinions granting summary judgment in favor of Norman-Spencer de novo and construe the facts in the light most favorable to WCPP and MGSA as the non-moving parties. *Rahn v. Bd. of Trs. of N. Ill. Univ.*, 803 F.3d 285, 287 (7th Cir. 2015). Summary judgment is appropriate if there is no genuine dispute of material fact and Norman-Spencer is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### B. WCPP's claims

#### 1. Negligence

Under Illinois law,[3] an insurance broker has a duty to exercise ordinary care and skill in renewing, procuring, binding, or placing coverage requested by the insured or proposed insured. *See* 735 ILCS 5/2–2201. This duty was an aspect of Illinois common law of negligence even before the statute was enacted. *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 40–41, 826 N.E.2d 1111, 1131–32 (2005).

There are three principles applicable to the duty of insurance brokers that are significant here. First, if the broker is authorized to engage sub-brokers, then the duty extends down the line to the sub-brokers who are engaged to procure insurance. *Id.* at 1126–27. Second, the duty can be breached if a broker fails to disclose information about the insurer that would be material to the insured's decision to place the insurance with that insurer. *Id.* at 1132. And third,

---

[3] Plaintiffs-appellants brought their claims under Illinois law, and Norman-Spencer does not dispute that Illinois law governs their claims.

the duty arises once the insured—or prospective insured—requests specific insurance coverage. *Skaperdas v. Country Cas. Ins. Co.*, 2015 IL 117021, ¶ 37, 28 N.E.3d 747, 756 ("Under section 2–2201(a), a duty to exercise ordinary care arises only after coverage is 'requested by the insured or proposed insured.'").

WCPP relies heavily on *AYH Holdings*, because that case, too, involved placement of a large, complex risk through a chain of brokers and sub-brokers. WCPP contends that, like the negligent sub-brokers in *AYH Holdings*, Norman-Spencer was negligent in failing to inform WCPP about the red flags Norman-Spencer discovered while investigating Ward and JRSO. WCPP argues that Norman-Spencer had a duty to WCPP under the IIPLA because NCAIG "directly requested that Norman-Spencer participate as a sub-agent."[4] Appellants' Brief, at 8. But this last point is a factual contention that must be supported by evidence.

On appeal, WCPP contends that three pieces of evidence supported this contention: (1) the unexecuted "Memorandum of Understanding" created by Brian Norman memorializing Norman-Spencer's role in Ward's JRSO program, as

---

[4] In the fact section of their brief-in-chief, appellants state that NCAIG "directly requested that Norman-Spencer participate as a sub-agent." Appellants' Brief, at 8. Appellants' cite for this proposition the expert report of Scott Stein, Dist. Ct. Dkt. 199-17. But appellants do not cite or rely on this report in the argument section of their brief. Our review of the report shows that the specific page cited by appellants, *id*. at 9, does not contain any suggestion that NCAIG directly requested Norman-Spencer's involvement as a sub-agent, nor does the document as a whole explain when or how NCAIG requested Norman-Spencer's involvement. And, of course, this is a factual proposition that would not likely be within the personal knowledge of an expert.

discussed at their November 11, 2011, meeting; (2) a December 2011 conversation between Norman and Littlejohn (of NCAIG) discussing Norman-Spencer accepting a reduced commission for it to be involved in the WCPP insurance placement; and (3) a January 17, 2012 email from Mark Young of York Risk Services to Norman and Littlejohn regarding WCPP claims that identified Norman-Spencer as the "broker on this program."

But none of this evidence creates a genuine dispute of material fact about Norman-Spencer's involvement. We start with the memorandum of understanding. Even if we ignore the fact that the memorandum was not executed, the document as written indicated only *Ward's* desire to have Norman-Spencer involved in the WCPP placement. The document does not support WCPP's argument that *NCAIG* requested Norman-Spencer's involvement. And WCPP does not develop an argument that a request from Ward or JRSO would trigger liability for Norman-Spencer under § 2–2201(a). Such an argument would be futile because Ward and JRSO were the providers of the purported insurance; they were not positioned to ask Norman-Spencer to procure insurance for WCPP. But all this is hypothetical, because the undisputed facts show that Ward made it clear that Norman-Spencer was not to be involved with the WCPP placement because Ward did not want to cut Norman-Spencer in on the commissions.

The December 2011 conversation between Norman and Littlejohn discussing Norman-Spencer accepting a reduced commission to be involved in the placement does not establish that there was any request from NCAIG either. At that point, NCAIG was a part of the chain of insurance procurers

in the WCPP placement. But by November 1, NCAIG had already agreed to place the WCPP renewal with JRSO. Littlejohn "suggested that he didn't think it was fair" that Norman-Spencer was not involved in the placement, and clearly, Norman-Spencer would have liked to be involved in the placement. Appellants call this discussion a "negotiation with NCAIG for reduced commission rates for the WCPP renewal," Reply Brief, at 13 n.5, but that is a misleading characterization, because there were no commissions for Norman-Spencer to reduce. To the extent that Norman-Spencer ever "negotiated" for any commission on the WCPP placement, that negotiation was with Ward, who rejected Norman-Spencer's attempts to be involved.

Finally, the January 17, 2012 email from Mark Young suggesting that Norman-Spencer was the broker on the WCPP placement was simply a mistake on Young's part. Young's confusion about the scope of Norman-Spencer's involvement in the various components of the JRSO program does not create a dispute of material fact about Norman-Spencer's actual involvement. WCPP concedes that the message from Young was inaccurate. And in any event, the message does not support the specific argument WCPP makes here: that NCAIG requested that Norman-Spencer become a sub-agent in the chain of procuring agents.

The district court was correct: there is no evidence that any broker in the procurement chain ever requested that Norman-Spencer serve as a sub-broker to procure insurance for WCPP. Norman-Spencer had no duty to WCPP under § 2–2201(a).

WCPP poses an alternative argument: that Norman-Spencer owed a duty not just under § 2–2201(a), but under

more general "common law negligence principles." Appellants' Brief, at 34 n.4. WCPP argues that "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act," *id*. at 25 (citing *Skaperdas*, 2015 IL 117021, ¶ 25), and that "[a]n insurance producer also owes a duty of care based on the negligence principle of affirmative undertaking, which provides that a person who begins a service for another must exercise reasonable care in performing the service to avoid injury to the beneficiary of the undertaking," *id*. (citing *Talbot v. Country Life Ins. Co.*, 8 Ill. App. 3d 1062, 1065, 291 N.E.2d 830, 832 (1973)).

WCPP's alternative argument is neither well developed nor persuasive. None of the cases that WCPP cites involve an insurance agent or broker held to have undertaken a duty in the absence of a request for specific coverage or the equivalent of such a request. For example, in *Talbot*, the insured filled out an application and paid a premium for life insurance. 291 N.E.2d at 831. But the agent failed to process the application, and the beneficiary's claim was denied. *Id*. The Illinois appellate court held that the agent had entered an affirmative undertaking by taking the application and thus had induced the insured's reliance, and under those circumstances, the agent owed a duty to the applicant. *Id*. at 832; *see also Bovan v. Am. Family Life Ins. Co.*, 386 Ill. App. 3d 933, 940, 897 N.E.2d 288, 294 (2008) ("If an insurance agent acts so as to induce detrimental reliance by the proposed insured, the agent thereby undertakes an individual duty not to betray that reliance by his subsequent acts."). Here, the evidence shows that Norman-Spencer wanted to get in on the WCPP deal, but no one asked it to procure insurance for WCPP, and it made no affirmative undertaking to do so.

After the enactment of § 2–2201, Illinois courts considering negligence claims against insurance brokers have been reluctant to expand the duties of brokers and agents beyond those articulated in the statute. Generally, a duty to the insured arises only after specific coverage is requested, and courts have not considered negligence claims grounded in more general negligence principles outside the scope of § 2–2201(a)'s language. *See Skaperdas*, 2015 IL 117021, ¶ 37; *see also Office Furnishings, Ltd. v. A.F. Crissie & Co., Ltd.*, 2015 IL App (1st) 141724, ¶ 25, 44 N.E.3d 562, 568–69 ("Plaintiff, however, is essentially arguing that by engaging in the aforementioned conduct, Werner created a duty, beyond the exercise of ordinary care outlined in *Skaperdas*, to verify the accuracy of the information on the insurance application and to review the application with defendants. [The Illinois Supreme Court] made clear in *Skaperdas* that section 2–2201(a) of the Code imposes on an insurance producer only a duty to exercise ordinary care in renewing, procuring, binding, or placing the coverage specifically requested by the insured."), *petition for leave to appeal denied*, No. 120348 (Ill. Mar. 30, 2016); *Melrose Park Sundries, Inc. v. Carlini*, 399 Ill. App. 3d 915, 920, 927 N.E.2d 132, 136 (2010) ("To hold Carlini responsible for insurance coverage beyond that requested by Melrose Park would extend the duty of ordinary care beyond that expressly defined [in § 2–2201(a)] by the legislature.").

We conclude that under Illinois law, and the facts of this case, Norman-Spencer had no duty to WCPP, and the district court properly entered summary judgment in favor of Norman-Spencer on WCPP's negligence claim.

*2. Breach of fiduciary duty*

WCPP appears to have abandoned its breach of fiduciary duty claim, because appellants briefed the fiduciary duty issue only in the context of the Myan Management policy. Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority. *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006). In any event, this claim would fail for reasons similar to the negligence claim.

The district court granted Norman-Spencer summary judgment on WCPP's breach of fiduciary duty claim, applying § 2–2201(b) of the IIPLA. That section narrowly defines the scope of a breach of fiduciary duty claim, limiting such claims to "conduct … involv[ing] the wrongful retention or misappropriation … of any money that was received as premiums, as a premium deposit, or as payment of a claim."

The court concluded that Norman-Spencer could not be liable under this provision because it did not receive any money from the WCPP placement or participate in that placement. We agree. WCPP does not present any evidence showing that Norman-Spencer retained or misappropriated any WCPP funds. Rather, it is undisputed that Norman-Spencer did not receive a commission for the WCPP placement.

**C. MGSA's claims**

*1. Negligence*

MGSA also brought a negligence claim against Norman-Spencer regarding the Myan Management policy.[5] Norman-

---

[5] To the extent that MGSA brought a negligence claim based on the WCPP policy, the district court concluded that its order dismissing

Spencer was involved in the Myan Management policy; it was one of the 64 backlogged policies that Norman-Spencer issued as part of its administration agreement with Ward. But the policy was bound before Norman-Spencer got involved, and Norman-Spencer received a flat fee for performing certain administrative tasks on all the backlogged policies.

Norman-Spencer's limited role in the Myan Management policy raises similar questions to those discussed above about whether Norman-Spencer owed a duty to the insured—here, Myan Management. The district court opinion suggests that MGSA's claim failed for multiple reasons: because Myan Management itself did not request insurance from Norman-Spencer; because none of the brokers in the procurement chain requested insurance from Norman-Spencer; and because none of Norman-Spencer's actions constituted "renewing, procuring, binding, or placing" the Myan Management policy under § 2–2201(a).

But it is unnecessary for us to consider these possibilities because there is a more obvious defect in this claim. Even if Norman-Spencer had a duty to the "insured" under § 2–2201(a), MGSA could not sustain a claim regarding the Myan Management policy because MGSA was not the insured on that policy. This is clear from the face of the policy, which lists "Myan Management Group" as the insured, not MGSA. Dist. Ct. Dkt. 215-11.

WCPP's claims applied to any claims MGSA might have brought regarding the WCPP policy as well. We agree with that conclusion, and affirm the district court's ruling on those claims for the same reasons discussed above regarding WCPP's claims.

MGSA does not explicitly address this issue in its brief-in-chief, which would be reason enough to consider any objection to that portion of the district court's ruling waived. *See Hook*, 471 F.3d at 775. Even overlooking the potential waiver, MGSA fails to show that it is entitled to a trial on this claim.

In appellants' reply brief, MGSA contends that it qualified as an "insured" because it was acting in the same capacity toward Myan Management as WCPP was acting toward the properties in the WCPP program. But this is belied by the face of the insurance documents: WCPP is listed as the insured on the executed WCPP insurance proposal,[6] whereas MGSA is not listed as the insured on the Myan Management policy. MGSA goes on to say that it "was not acting simply as the Myan Account's broker; it was acting as an end user, client representative, non-site management entity, and program administrator." Reply Brief, at 16. But MGSA does not explain how any of these other roles convert it into an "insured" on Myan Management's insurance contract for purposes of a claim under § 2–2201(a). This undeveloped argument gives no reason to reverse the district court's judgment on this claim.

MGSA attempts to sidestep § 2–2201(a) entirely by arguing that its negligence claims are based on "common law negligence principles" in addition to § 2–2201(a), which we take to be an argument that Norman-Spencer owed MGSA a duty even if MGSA is not actually the "insured" on the Myan Management policy. MGSA argues that "every person

---

[6] The parties agree on this point, but they do not point to the actual WCPP insurance policy in the record.

owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." Appellants' Brief, at 25. As we explained above, Illinois courts have not viewed the duty of insurance brokers so expansively: § 2–2201(a) alone defines the duty of ordinary care regarding the procurement of insurance in Illinois. MGSA does not fall within that definition because it is not the insured, and appellants point us to no case in which an insurance broker owed a duty to a similarly situated non-insured.

Finally, MGSA argues that because it absorbed the additional cost in obtaining replacement insurance rather than passing those costs onto Myan Management, it "bore the costs on behalf of another and, in equity, should receive reimbursement for the payment of such costs." Reply Brief, at 17 (citing *Remsen v. Midway Liquors, Inc.*, 30 Ill. App. 2d 132, 143–44, 174 N.E.2d 7 (1961) (discussing subrogation agreement in car insurance policy)). This argument is waived, both because MGSA did not raise it until its reply brief and because MGSA does not explain why subrogation principles should apply in this instance.

### 2. *Breach of fiduciary duty*

MGSA also brought a breach of fiduciary duty claim against Norman-Spencer for wrongfully retaining money it received for issuing the Myan Management policy. MGSA cannot bring a claim under § 2–2201(b) of the IIPLA because Norman-Spencer did not misappropriate MGSA's funds. Because Myan Management was the insured on that policy, *Myan Management's* funds paid for the premium, not MGSA's—MGSA merely forwarded the premium payment using Myan Management's funds.

### D. MC Risk's and NCAIG's cross-claims

MC Risk and NCAIG assigned their respective cross-claims for contribution and indemnity against Norman-Spencer to WCPP and MGSA. Because neither WCPP nor MGSA can sustain direct claims against Norman-Spencer, the cross-claims for contribution and indemnity also fail.

### III. Conclusion

The judgment of the district court is AFFIRMED.