In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 18-2205

LANDMARK AMERICAN INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

DEERFIELD CONSTRUCTION, INC., and SHAWN GRAFF,

*Defendants/Third Party Plaintiffs-Appellants,*

*v.*

ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, INC.

*Third Party Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 1785 — **Rubén Castillo**, *Judge.*

———————

ARGUED MAY 28, 2019 — DECIDED AUGUST 12, 2019

———————

Before WOOD, *Chief Judge*, and BAUER and EASTERBROOK,
*Circuit Judges*.

WOOD, *Chief Judge*. The question in this case is a simple
one: who must cover certain costs arising from an automobile

accident involving an employee of Deerfield Construction, Inc.: Deerfield, or its excess insurer, Landmark American Insurance Company? Deerfield's primary insurer was on the hook for the first $1 million, and in principle, Landmark would cover any costs above that, up to $10 million. But Landmark's policy unsurprisingly made coverage contingent on proper notice of the accident. Deerfield did not tell Landmark anything about either the accident or the resulting lawsuit until seven years later, on the eve of trial. When the jury returned a $2 million verdict in favor of the accident victim, Landmark refused to cover the excess amount because it received such late notice. Deerfield now asserts that its notice, despite the timing, satisfied the policy. The district court found that the undisputed facts entitled Landmark to summary judgment; it dismissed all other parties. We affirm.

## I

In reviewing a grant of either summary judgment or a motion to dismiss, we view the facts in the light most favorable to the nonmovant. We accept well pleaded factual allegations as true in the case of a motion to dismiss, and for summary judgment, we resolve factual disputes and draw reasonable inferences in the nonmovant's favor. See *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (stating the standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)); *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) (stating the standard for resolving a motion for summary judgment). The following account of the events in this case should be understood with that perspective in mind.

Deerfield Construction is a company specializing in construction projects for the telecommunications industry.

Shawn Graff is one of its employees. On January 16, 2008, Graff got into an automobile accident with Ryan Keeping. That accident has to date spawned 11 years of litigation.

Deerfield had a primary commercial automobile insurance policy through American States Insurance Company; that policy covered it for up to $1 million in liability. It procured the American States policy through its broker, Arthur J. Gallagher Risk Management Services, Inc. ("Gallagher"). Gallagher also helped Deerfield obtain an excess insurance policy from Landmark. That policy would kick in only after Deerfield's liability exceeded $1 million; it covered loss up to $10 million.

After Graff's accident, Deerfield promptly informed American States and Gallagher of the occurrence. It did so through the offices of an intermediary company, Laurus Strategies. This was not its only business contact with Laurus. Laurus often answered insurance-related questions that arose for Deerfield. No one, however, said anything about the Graff accident to Landmark—not Deerfield, not American States, not Gallagher, and not Laurus—and the silence continued even after Keeping filed a lawsuit against Graff and Deerfield.

The Keeping lawsuit proceeded apace. Pursuant to the American States primary policy, American States assumed the defense of the suit and hired David Olmstead, who worked for the Law Offices of Meachum, Starck, Boyle & Trafman ("the Law Offices"), to represent Deerfield's interests. Even then, neither American States nor Olmstead informed Landmark about the ongoing litigation.

Perhaps showing a gambler's spirit, American States relied entirely on its own evaluation of Keeping's lawsuit,

which it thought lacked any merit. Throughout five years of pre-trial proceedings, it never offered the full $1 million value of the policy to settle the suit. Indeed, it was not until the trial was almost over and jury deliberations began that it even came close. But American States and Olmstead were aware that Keeping valued his lawsuit much more highly than they did. In April 2013, more than a year before trial, Keeping made a $1.25 million demand to settle the lawsuit. This demand was high enough to trigger Deerfield's excess insurance coverage, but still no one notified Landmark about the pending case. Instead, American States counteroffered with $75,000.

On December 5, 2014, about six weeks before trial, Landmark finally found out about Keeping's lawsuit—not from American States or Deerfield, but from Gallagher. Landmark was nonplussed. It issued a reservation of rights letter to Gallagher, but it did not send this letter to American States, Deerfield, or Laurus. Its claims adjuster evaluated the case as having a settlement value between $500,000 and $750,000. Because this was lower than the American States primary policy's limits, Landmark reserved only $1.00 for its potential liability in its internal case tracking system; this was the minimum amount necessary to keep a case marked as open.

By the time trial commenced, Landmark was receiving regular updates on the case. But it was largely a passive bystander: at no point did Landmark attempt to alter American States's trial strategy, nor did it provide much substantive input. As the trial neared its end, the two sides came back to the table for further settlement negotiations. Before Keeping's closing argument, the parties drew up a rough outline of a high-low settlement, which called for Keeping to receive at

least $100,000 and at most $1 million, depending on the jury's verdict. But the parties ultimately backed away from a settlement because they could not agree on the "low" end: Keeping wanted a $175,000 guarantee, and American States was not ready to go above $100,000. American States apparently intended to counteroffer with a $150,000 low, but it ran out of time: the jury returned with a verdict. Before the verdict was formally announced, American States assumed that the jury had sided with the defense and there was thus no reason to resume settlement negotiations. Deerfield did not even know that the high-low negotiations were occurring, although Olmstead was involved. Landmark did know. While the jury was deliberating, American States's attorney asked Landmark whether it would be willing to contribute to the settlement. It declined to do so. Landmark offered only the advice that American States should settle the case for somewhere within the primary policy limit of $1 million.

On January 16, 2015, the jury announced that it had reached a verdict of $2.368 million in Keeping's favor. This was ultimately remitted to approximately $2.3 million. On January 29, 2015, Landmark notified Deerfield and Graff that it was reserving its rights to deny coverage because of late notice.

Landmark followed up with this lawsuit, in which it sought a declaratory judgment that it did not have to cover Deerfield and Graff's loss because notice to it about the accident and lawsuit was untimely. Deerfield and Graff responded with a third-party complaint against American States, Olmstead and the Law Offices, and Gallagher. Relatively early in the case, the district court granted Gallagher's motion to dismiss for failure to state a claim, because it found

that Illinois law imposed no duty on an insurance broker to provide notice of an insured's claims. The case then proceeded through discovery without Gallagher. Eighteen months after Gallagher was dismissed, Deerfield sought to amend its complaint to assert new claims against Gallagher, as well as to name several related defendants in American States's corporate family. The district court denied that request as untimely. After the close of discovery, the district court granted summary judgment for Landmark, holding that Deerfield's notice was unreasonably late as a matter of law. With that portion of the suit finished, the district court declined to continue to exercise supplemental jurisdiction over the remainder of Deerfield's third-party complaint, as the parties were not completely diverse and there was little to no risk of prejudice to the parties from having to litigate the claims in state court.

Deerfield appealed all of these rulings. American States, Olmstead, and the Law Offices cross-appealed, but the cross-appeal was voluntarily dismissed before oral argument. See FED. R. APP. P. 42(b).

## II

### A

Under Illinois law, which all parties agree applies to this case, whether an insured's notice to its insurer was timely is determined by the totality of the circumstances. See *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 312 (2006). The Supreme Court of Illinois has identified five non-dispositive factors to aid in this inquiry: "(1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's

awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *W. Am. Ins. Co. v. Yorkville Nat. Bank*, 238 Ill. 2d 177, 185–86 (2010).

Few, if any, of these factors favor Deerfield. The language of Landmark's policy states that the insured must give "prompt" notice. Landmark identifies several older Illinois intermediate appellate courts that have interpreted this language to require an insured to provide notice as soon as it could. See, *e.g.*, *Gen. Cas. Co. v. Juhl*, 283 Ill. App. 3d 376, 380 (1996). More recently, the Illinois Supreme Court drew the line differently, contrasting policy language calling for "immediate" or "as soon as practicable" notice with that which "identif[ied] a specific time frame for giving notice." *Yorkville*, 238 Ill. 2d at 186. The former non-specific modifiers require only that an insured provide notice within a reasonable time. *Id.* Because Landmark's policy "does not identify a specific time frame for giving notice," the policy's language is more open-ended. Nonetheless, we find it difficult to believe that the state supreme court would regard notice that comes along only after five to seven years as anywhere close to being either "prompt" or "as soon as practicable." This point, to the extent it is useful, goes to Landmark.

Deerfield contends that the second factor—whether it was "sophisticat[ed] in commerce and insurance matters"—favors it because it never had an excess insurance claim before. But that unnecessarily narrows the scope of the inquiry. Deerfield is a 50-plus employee company, and it "was savvy enough to have both primary and excess … coverage." *MHM Servs., Inc. v. Assurance Co. of Am.*, 2012 IL App (1st) 112171, ¶ 64 (2012). Deerfield had counsel to aid it in the Keeping lawsuit, and it

could call on Laurus for help with insurance questions. As Deerfield admits in its brief, "Laurus … assisted Deerfield as an intermediary for insurance related communications." Deerfield now says that its counsel was tortiously ineffective, and that it believed that Laurus's providing notice to Gallagher was the same as providing that notice to Landmark. But neither of those contentions explains why Landmark—as opposed to Laurus, the Law Offices, or perhaps Gallagher—should be held responsible for the lateness of the notice. This consideration too cuts in Landmark's favor.

The third factor, whether the insured was aware of a triggering event, also plainly favors Landmark. At the latest, Deerfield was aware that the Keeping lawsuit could trigger its excess insurance coverage when Keeping made a $1.25 million demand in April 2013. Yet Landmark did not receive notice for another two years. Deerfield argues that Olmstead never made it aware of this demand, but Illinois law is clear that an attorney's knowledge is imputed to her client, "notwithstanding whether the attorney has actually communicated such knowledge to the client." *Yugoslav-Am. Cultural Ctr., Inc. v. Parkway Bank and Trust Co.*, 289 Ill. App. 3d 728, 737 (1997).

Under the fourth *Yorkville* factor, we must determine "[w]hether the insured, acting as a reasonably prudent person, believed the occurrence or lawsuit was not covered by the policy." *Yorkville*, 238 Ill. 2d at 188. Deerfield contends that this factor favors it because at multiple points people more knowledgeable than it in the insurance field stated their belief that Keeping's lawsuit was "frivolous" and would not exceed the American States primary policy limits.

But Deerfield misunderstands the inquiry. This factor is not about Deerfield's, or anyone else's, ability accurately to predict the potential outcome of a lawsuit. Instead, it is about whether the facts underlying the incident are covered by the policy's terms. See, *e.g.*, *Grasso v. Mid-Century Ins. Co.*, 181 Ill. App. 3d 286, 290 (1989) (excusing a two-year delay when insured did not reasonably believe that an accident in her boyfriend's Jeep was covered by her father's excess coverage insurance policy); *Brotherhood Mut. Ins. Co. v. Roseth*, 177 Ill. App. 3d 443, 449 (1988) (same when insureds did not reasonably believe that an accidental shooting occurring outside their home was covered by their homeowner's policy). Unlike the insureds in *Grasso* and *Roseth*, Deerfield and the people on whom it supposedly relied all believed that the Landmark policy *would* cover any loss from the Keeping lawsuit, provided a jury returned a high enough verdict. Given the fact that Deerfield never questioned the applicability of Landmark's policy, its failure to send even a cursory email to Landmark cannot be described as the behavior of "a reasonably prudent person." *Yorkville*, 238 Ill. 2d at 188.

Finally, Illinois courts consider whether the insurer was prejudiced by the insured's late notice. Landmark's argument that Illinois does not require prejudice when the question is one of "prompt notice" misses the point. The Supreme Court of Illinois has stated multiple times that "the presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice." *Livorsi Marine*, 222 Ill. 2d at 317; see also *Yorkville*, 238 Ill. 2d at 185–86, 189. While the lack of prejudice does not doom an insurer's case, it is a relevant consideration.

Landmark asserts that the delay inflicted prejudice on it because it lost the chance to receive litigation updates until shortly before trial, and because it would have encouraged earlier settlement. As a general matter, an excess insurer is prejudiced when it is "deprived of any meaningful participation in the defense until the case was in the last possible stage." *MHM Servs., Inc.*, 2012 IL App (1st) 112171, ¶ 76. We recognize that this is not the strongest point for Landmark, given its actions (or lack thereof) after it learned of the case. In the current case, Landmark has conceded that it had no criticism of how the Keeping case was handled. And when Landmark was given the opportunity to facilitate settlement during the trial, it declined. On the other hand, Landmark learned about the underlying suit so late in the game that many potential steps were no longer possible. Landmark may have thought that the costs of a last-minute overhaul of American States's trial strategy would outweigh the benefits.

Landmark points to one place during the Keeping lawsuit where its participation may have made a difference. Before trial, the parties were scheduled to engage in mediation. American States canceled that session because it viewed the two sides' demands as being too far apart. Landmark avers that it would have attempted to facilitate the mediation, thereby potentially ending the suit at a much lower cost to all parties than the $2.3 million jury verdict. In the end, the prejudice question is either a tie or slightly favors Landmark.

Finally, although *Yorkville* sets out five points for courts to consider when determining whether notice was proper, it does not establish a closed set: the test remains one that requires an assessment of the totality of the circumstances. When considering the totality of the circumstances, at some

point common sense comes into play. Landmark did not receive notice until *seven years* after Graff and Keeping's accident. This was not a case of a slowly developing tort, where the parties could identify the genesis of the injury only years after the harmful activity occurred. This was an automobile accident. Deerfield could have emailed, mailed a letter, or perhaps just have called Landmark to tell it about the accident as soon as it occurred (just as it did for American States), or it could have taken any of those steps when it was served with Keeping's lawsuit. But it did not. The conclusion is irresistible that Deerfield's notice was untimely and unreasonable as a matter of law.

B

Deerfield has two more arrows in its quiver; we address them briefly. First, it argues that Landmark should be estopped from asserting a late notice defense; second, it urges that Gallagher was Landmark's apparent agent, and thus that the notice it immediately provided to Gallagher should be imputed to Landmark. Neither argument wins the day.

1

Landmark argues that estoppel cannot apply to it in this scenario because under Illinois law, insurers are subject to equitable estoppel only when they breach their duty to defend. It relies on *North River Insurance Co. v. Grinnell Mutual Reinsurance Co.*, 369 Ill. App. 3d 563 (2006), which holds that "[i]t is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter." *Id.* at 570 (quoting *Montgomery Ward & Co., Inc. v. Home Ins. Co.*, 324 Ill. App. 3d 441, 450 (2001)). But that

reading of Illinois's treatment of this equitable doctrine is too broad.

As the state supreme court has noted, two versions of equitable estoppel have developed in Illinois. The first is the one identified by Landmark, which arises only when an insurer breaches its duty to defend. The second is the more traditional form of equitable estoppel, which asks the usual question whether the potentially estopped party made a knowing misrepresentation on which it intended its opposition detrimentally to rely. See *Emp'rs Ins. of Wausau v. Ehlco Liquidating Tr.*, 186 Ill. 2d 127, 151 (1999).

The proper focus here is not on any breach of Landmark's duty to defend, but instead on whether Landmark's actions meet the traditional criteria for equitable estoppel. Illinois has a six-part test for equitable estoppel, but here two are dispositive: whether Landmark "misrepresented or concealed material facts" and whether Deerfield "reasonably relied upon the representations in good faith to [its] detriment." *First Mercury Ins. Co. v. Ciolino*, 2018 IL App (1st) 171532, ¶ 52 (2018). Deerfield contends that Landmark concealed the fact that it was reserving its rights until after the jury verdict. Had it known about the reservation of rights before the verdict, Deerfield says that it would have been more active in the Keeping trial and would have forced American States to settle within the primary policy limits, perhaps by contributing to a potential high-low settlement.

Landmark's minimal participation at the trial stage of the Keeping case was not the type of "misrepresentation" that gives rise to equitable estoppel. Indeed, it was not a misrepresentation at all. Landmark's actions during trial were fully consistent with an insurer that wishes to assert its right not to

cover a loss. This explains why, when given the opportunity to assist with settlement, Landmark declined.

At no point did Landmark inform *Deerfield* that it was not going to stand on its rights. When Gallagher first gave it notice of the Keeping lawsuit, Landmark told *American States* that American States "has the coverage for this loss." But Deerfield and American States were and are separate entities. American States may have defended the Keeping lawsuit, but Deerfield had its own representation in that case through Olmstead and the Law Offices. Deerfield has presented no evidence that American States later passed on Landmark's statement to Deerfield or Olmstead, and so even if this statement constituted a misrepresentation (and we are not saying it was), Deerfield could not have relied on it. Landmark is not equitably estopped from asserting a late notice defense.

2

Deerfield also has not pointed to facts suggesting that Gallagher was Landmark's apparent agent. As our cases applying Illinois law have explained, a broker does not become the apparent agent of an insurer where, as here, it performs traditional brokerage activities. See *Mizuho Corporate Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 655–56 (7th Cir. 2003); *Archer Daniels Midland Co. v. Hartford Fire Ins. Co.*, 243 F.3d 369, 373–74 (7th Cir. 2001). The tasks that Gallagher performed for Landmark, such as sending bills and collecting payments, fall into the bucket of traditional brokerage activities. Indeed, Andrew Hulett, who helped Deerfield get the Landmark policy, called this set-up the industry standard.

Language in the Landmark policy stating that notice can be given to an "authorized representative" does not help

Deerfield. Landmark never identifies who its "authorized representative" is. While Deerfield points to one page of the policy which states "Agent: Arthur J Gallagher Risk MGT," it is clear from context that this refers to Gallagher being an agent for Deerfield, not for Landmark. Further down that same page Landmark instructs the policyholder "to report all newly hired employees to *your agent* during the year" (emphasis added). Laurus may have told Deerfield that notice to Gallagher was notice to Landmark. But it is only Landmark's actions, and not Laurus's statements, that can create an apparent agency relationship between Gallagher and Landmark. Landmark took no such actions here.

## III

Reversing course, Deerfield finally attempts to revive its claims against Gallagher by arguing that Gallagher was not Landmark's agent, but its own. Under this theory, Deerfield argues that Gallagher should be liable for its loss because Gallagher breached its fiduciary duty to Deerfield. But Illinois law forecloses this claim. The Illinois Insurance Placement Liability Act, 735 ILCS 5/2-2201, relieves an insurance broker of a fiduciary duty when engaging in conduct "concerning the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance." *Id.* § 2-2201(b). The broker is liable only if negligent or when dealing with the "wrongful retention or misappropriation" of certain funds. *Id.* § 2-2201(b), (d). In *American Family Mutual Insurance Co. v. Krop*, 2018 IL 122556 (2018), the Illinois Supreme Court stated that the Act "prevents any insurance producer [*i.e.* broker] from being held to the fiduciary standard, except in a narrow set of circumstances" involving mismanagement of funds. *Id.* at ¶ 28. Because of that statute, it was

"clear" that the insurance broker in that case "owed no fiduciary obligations to the Krops" and had "to exercise [only] ordinary care." *Id.* Given *Krop*'s broad reading of the liability exception in section 5/2-2201, we cannot read the Act to suggest that an insurance broker has a fiduciary duty that extends beyond the performance of the limited brokerage actions identified in that statute. See also *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 320 (7th Cir. 2017).

Deerfield's negligence claim against Gallagher similarly fails. Although the Act expressly states that it does not curb negligence liability, 735 ILCS 5/2-2201(d), liability attaches only if a broker had a duty to perform the action it allegedly performed negligently. Deerfield has identified no Illinois cases establishing that insurance brokers have a duty to deliver notice of claims on behalf of an insured, and so its negligence claim fails.

Deerfield belatedly argues that Gallagher voluntarily entered into an "affirmative undertaking" to provide notice, and its undertaking created a duty to perform that act non-negligently. See *M.G. Skinner*, 845 F.3d at 319–20. But Deerfield first mentions this argument in its reply brief, and so it is waived. *Bernard v. Sessions*, 881 F.3d 1042, 1048 (7th Cir. 2018).

Finally, the district court did not abuse its discretion in denying Deerfield leave to amend. See *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). On appeal, Deerfield attempts to minimize how extensive its amendment would have been. It not only wanted to bring Gallagher back into the case; it also wanted to add two new defendants, Safeco and Liberty Mutual, corporate entities related to American States. Deerfield attempted to do this about a week before the close of

discovery, despite having the facts that might have supported a case against the affiliates years earlier. As the district court recognized, because the amendment came at the close of discovery, allowing Deerfield to amend would have necessitated re-opening discovery. It also would have prejudiced Gallagher, which had not participated in over a year of the parties' discovery by that time. This is exactly the type of "undue delay" that is a legitimate reason to deny amendment. See *Bell v. Taylor*, 827 F.3d 699, 705 (7th Cir. 2016).

**IV**

The importance of punctuality differs across cultures. A Japanese train conductor will apologize when the train leaves 20 seconds early. See Danielle Demetriou, *Why is Japan so obsessed with punctuality?*, THE TELEGRAPH (May 16, 2018), https://www.telegraph.co.uk/travel/destinations/asia/japan/articles/why-japan-so-obsessed-with-punctuality/.   By contrast, on some days, Chicagoans and New Yorkers consider themselves lucky if their train comes at all. Despite these differences, some cases are not close, and this is one of them. Waiting five to seven years before telling an insurance company that its policy may be implicated in a suit is too long. We AFFIRM the judgment of the district court.